IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **TOWER INSURANCE COMPANY OF NEW YORK,** a New York corporation,<br><br>    Plaintiff,<br><br>v.<br><br>**ROSE CITY AUTO GROUP, LLC,** an Oregon limited liability company**; LEONARD M. SHILEY,** an individual**; TERESA BYLE,** an individual**; LOGAN DRIEDRIC,** an individual**; JOANNA STONER**, an individual**; STEPHEN STONER,** an individual**; LOVE MARTINO,** an individual**; ANAN SRIVILAI**, an individual**; CAMERON JOHNSON**, an individual**; JONATHAN GILBERT,** an individual**; TINA HARRAL,** an individual; **ROY WIEGAND,** an individual; **NATHAN LANGER,** an individual**; KAREN BERSINE,** an individual**; MELISSA STEVENS,** an individual**; TONY EDWARDS,** an individual**; DEBBIE RECKTANGLE,** an individual**; RODNEY JENKINS,** an individual**; STEPHEN SCHANTIN,** an individual**; BRITTANY LAWRENCE,** an individual**; MATT REED,** an individual**; SHERIAL REED,** an individual**; RACHEL SCHANTIN**, an individual**; EZEKIAL HUNT,** an individual**; BOBBY HEAGLE,** an individual**; LANEY BLANKENSHIP**, an individual**; LONNEY FRANCIS,** an individual**; OREGON COMMUNITY CREDIT UNION,** an Oregon non-profit entity**; TWINSTAR CREDIT UNION,** | Case No. 14-cv-00975-MO<br><br>**Opinion Regarding Resolution of Claims and Final Disbursement of Funds** |

    Defendants.

    **MOSMAN, J.**,

1 – OPINION

## BACKGROUND

Tower Insurance Company of New York ("Tower") filed this action under the federal interpleader statute, 28 U.S.C. § 1335. Tower posted a $40,000 bond for Rose City Auto Group ("Rose City") as required for a vehicle dealer to be certified in the state of Oregon. ORS 822.020 (2015). Rose City went out of business, leaving many of its obligations unfulfilled. Defendants are Rose City and various other parties who may have had claims against the bond.

Tower received an order of interpleader discharging it from any further liability [32] and posted the bond amount of $40,000 [39]. Tower also collected $12,170.42 to recoup its costs and attorney fees [40], leaving the sum of $27,829.58 to pay claims. Five parties now assert claims or otherwise contend for the remaining funds:

- A. **JoAnna and Stephen Stoner** are individuals who purchased a truck from Rose City.
- B. **Twinstar Credit Union** ("Twinstar") loaned money to retail purchasers who bought vehicles from Rose City.
- C. **Unitus Community Credit Union** ("UCCU") loaned money to Leonard Shiley (Rose City's owner) so that he could buy a car from Rose City.
- D. **Westlake Flooring Company** ("Westlake") loaned money to Rose City to finance their inventory.
- E. **Tower Insurance** is entitled to any residue of the bond not paid to claimants.

The other named Defendants have failed to appear, failed to make a claim, or withdrawn their claims. The claims take various forms,[1] but are all essentially vying for the remaining funds.

\\

\\

---

[1] Unitus [21] and Westlake [22] filed answers with counterclaims. The Stoners filed a *pro se* "Motion" [41]. Twinstar filed a claim [46]. Plaintiff Tower filed a "Motion Regarding Resolution of Claims and Final Disbursement of Funds" [53], asking for the claims to be resolved and requesting any remaining unpaid funds be returned to it.

2 – OPINION

**DISCUSSION**

### I.  Bond Claims under the Statute

The parties agree that the standard governing the claims against the bond is embodied in ORS 822.030, which provides in relevant part:

> (2) Any person shall have a right of action against a vehicle dealer, against the surety on the vehicle dealer's bond and against the letter of credit in the person's own name *if the person suffers any loss or damage by reason of the vehicle dealer's fraud, fraudulent representations or violations of provisions of the vehicle code* relating to:
>     (a) Vehicle registration;
>     (b) Vehicle permits;
>     (c) The transfer or alteration of vehicles; or
>     (d) The regulation of vehicle dealers.
> (3) Notwithstanding subsection (2) of this section, the maximum amount available under a bond described in subsection (1)(c)(B) of this section for the payment of claims by persons other than retail customers of the dealer is $20,000.

ORS 822.030 (West 2015) (emphasis added). In short, for their claim against the bond to succeed, a claimant must show their loss or damage was caused by Rose City's fraud or certain violations of the vehicle code.[2]

### A.  *Violation of the Vehicle Code*

Violations of the vehicle code relevant here are ORS 822.045(1)(j) "failure to provide clear title," and ORS 822.045(1)(k), "failure to furnish certificate or title or application for title." Both subsections fall within the types of violations that allow for a bond claim as they relate to "[v]ehicle registration;" the "transfer . . . of vehicles;" or the "regulation of vehicle dealers." ORS 822.030.

\\

---

[2] The parties cite *General Electric Credit Corp. v. United Pacific Insurance Company*, 80 Or. App. 129, 135 (1986), for the general principle that the bond statute is a remedial one designed to protect persons injured by the bonded party and therefore one that should be construed liberally to accomplish this purpose. While this is correct, the statute cannot be construed so liberally as to avoid the basic requirement that the claims be based on fraud or the specified violations of the vehicle code.

3 – OPINION

B.  *Fraud*

In Oregon, the elements of fraud are:

(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury.

*Conzelmann v. Nw. Poultry & Dairy Products Co.*, 190 Or. 332, 350 (1950); *see Knepper v. Brown*, 345 Or. 320, 329 (2008) (describing "nine elements of a claim for tortious fraud" and citing to *Conzelmann*).

## II.  The Claims

### A.  *The Stoners' Claim*

The Stoners are the sole consumer claimants in this action. They filed a handwritten *pro se* claim telling their story and attached the relevant paperwork to support it. While rough, it provides enough to support a valid claim against the bond based on Rose City's failure to transfer the title to the truck they purchased. *See* ORS 822.045(1)(k).

The Stoners purchased a truck from Rose City for $13,683.00 on September 9, 2013. Under ORS 822.045(1)(k), Rose City had ninety days to submit an application for title on the Stoners' behalf. Although Rose City collected the taxes due and even charged the Stoners a $95.00 "title fee," the dealer never did submit the application and the Stoners were unable to properly register their truck. They eventually had to contact the person who owned the truck before Rose City and execute a second "Bill of Sale" in order to transfer title. This cost them an additional $964.50 for the Title Application (including taxes that should have been paid by Rose City per the bill of sale), $25.00 for a temporary Trip Permit to register their truck while they

4 – OPINION

worked this out, and $11.54 in postage. This totals $1001.04 which is attributable to Rose City's failure to furnish the application for title on behalf of the Stoners.[3]

### B.    *UCCU's Claim*

UCCU loaned money to Leonard Shiley (the owner of Rose City) so that Shiley could purchase a 2008 Subaru Outback from his own company. As with most car loans, UCCU financed the sale under a loan agreement that provided it with a security interest in the vehicle. Under subsection (k), Rose City had ninety days to submit an application for title "on behalf of the person to whom the title is to be furnished *or whose name is to be shown on the title record*." ORS 822.045(1)(k)(B) (emphasis added). As UCCU was entitled to be named a security interest holder on the title, Rose City had a statutory duty to submit a title application naming UCCU as lienholder. Again, Rose City never fulfilled this duty.

Shiley made only two payments on the car and then defaulted, leaving an outstanding balance of $17,976.23 owed to UCCU. Because the title application was never filed, UCCU was unable to perfect its security interest in the vehicle. (UCCU's Ans. [21] at 3.)[4] UCCU supports its claim with evidence in the form of the Bump Declaration [68] and various exhibits, including the "Bill of Sale" (dated Aug. 7, 2013), the "Fixed Rate Loan Disclosure, Promissory Note, and Security Agreement" between Unitus and Shiley (Aug. 9, 2013), the deposited check for the full loan amount, and a summary of Shiley's loan account showing the outstanding balance of the loan and the fact it is well past due. Based on this evidence, UCCU has stated a valid claim for $17,976.23.

---

[3] The other parties do not contest the validity of the Stoners' claim, but incorrectly seized on the $964.50 as the claim amount.

[4] According to UCCU's counterclaim, Shiley actually sold the Subaru back to Rose City, and then turned around and refinanced it with Westlake. This too would provide adequate grounds for a valid bond claim. Under ORS 822.045(1)(j)(A) a dealer who *receives* an interest in a vehicle from a consumer has fifteen days to satisfy "[a]ll security interests in the vehicle . . . entered into prior to the time of transfer." Assuming what UCCU says is true, Rose City failed to discharge this duty as well.

5 – OPINION

### C. *Twinstar's Claim*

Twinstar loaned money to several retail consumers who purchased vehicles from Rose City. These loans were supposed to be secured by the vehicles the customer purchased. Twinstar alleges that "Rose City never provided clear title for the listed vehicles and converted the loan funds paid." (Twinstar's Resp. [59] at 2.) Much like UCCU, Twinstar should have been named as a lienholder on the title application that Rose City never submitted, so this would qualify as a violation of ORS 822.045(1)(k)(B).

However, Twinstar does not demonstrate that its claimed damages were "by reason of" this violation. ORS 822.030(2). This is fatal to its claim. *See Brasher's Cascade Auto Auction, Inc. v. Leon*, 247 Or. App. 535, 543 (2011) ("Plaintiff's argument overlooks the statutory requirement that a person have been harmed 'by reason of' the vehicle dealer's 'violations of provisions of the vehicle code.'"). Twinstar does not describe how it arrives at the claimed damages, provides no evidence that the loans have been defaulted on, and fails to demonstrate how it has actually been harmed by this violation.

The closest Twinstar comes is to say that it "suffered damages because of Rose City Auto's failures as it is unable to secure its interest in the vehicles for which it loaned money." ([59] at 3.) For evidence, they provide copies of the relevant loan agreements that the customers signed at purchase. But this is no evidence of damages at all. The customers could be happily making their payments every month (with interest), oblivious to this entire dispute. There is even some evidence that may have happened with at least some of the claimed damages.[5] Twinstar apparently acknowledged this and withdrew portions of their initial claim. (*See* [70] at 2.)

---

[5] The Stoners financed their truck with Twinstar, and their loan agreement is provided as Exhibit 6 to the Nelson Declaration [47]. The Stoner's loan is included in Twinstar's initial damage calculation, at what I can only assume was the outstanding balance at the time of $13,023.52. For one, the Stoners maintain that they have never even been late on a payment. (*See* Stoner [41] at 2.) For two, the title that the Stoners finally obtained *included* Twinstar as a lienholder on the title.

6 – OPINION

However, Twinstar has done nothing to shore up the claim amounts that remain, and no evidence supports even their "amended claim" amount of $33,866.18. Twinstar's claim is therefore denied.

### D.   *Westlake's Claim*

Westlake had what car dealers call a "flooring contract" with Rose City—essentially an ongoing contract to loan money to finance the dealer's inventory. Rose City would buy vehicles at auction and Westlake would pay for them. In exchange, Westlake was entitled to a security interest in the vehicles, as well as a monthly premium paid on each vehicle as long as it sat on the Rose City lot. When Rose City sold a vehicle, it was supposed to take the purchase money from the customer and use it to pay off Westlake's loan on that vehicle. Westlake would then release the title to the final purchaser.

Like many of the obligations Rose City shirked, the dealer failed to do this too. It appears that Rose City pocketed the purchase money from a number of its customers and even lied to Westlake (telling Westlake they had not sold cars that had in fact sold) to avoid paying off the loans in full.

Unlike the other claimants, Westlake bases its claim solely upon fraud by Rose City.[6] Without any reference to the elements of fraud whatever, Westlake makes a conclusory assertion that its "bond claim is based on the fraudulent activity of Rose City Auto Group . . . and its principal, Leanard M. Shiley." In support, Westlake offers an uncatalogued trove of documents attached to its "Answer, Counterclaim, and Crossclaims" [22], bringing it to 136 pages in total. These include the entire financing agreement between Westlake and Rose City, an investigative report by Mr. Pat Amato that provides some details on each of the vehicles Rose City never paid

---

[6] Flooring type contracts are specifically excepted from violations of the vehicle code based on ORS 822.045(2) "failure to provide clear title." But they are actually NOT excepted from ORS 822.045(k), the section that would more properly apply to Westlake's claim.

7 – OPINION

off, and a variety of documents that appear to be business records and titles relating to the purchase of the vehicles by Rose City.

Westlake initially claimed $44,748.33 for some 21 vehicles that Rose City failed to pay off. When Twinstar pointed out the fact that Westlake actually held title to a number of these vehicles, Westlake withdrew its claims regarding ten vehicles it admitted holding title to. This brings its claim amount down to $18,918.05. (*See* [66] at 8.)

### 1. Fraud?

As noted above, a claim of fraud under Oregon Law requires nine elements. *Conzelmann*, 190 Or. at 350. I deal with each in turn.

**(1) Representation** – Rose City/Shiley represented that it would pay off the vehicles Westlake financed when a consumer purchased them.

**(2) Falsity** – The promise to pay was false. Evidence of this comes from the short timeframe of many of these events. Some of the vehicles "floored" by Westlake were found missing from Rose City's lot only days after they were floored, with Rose City lying about their whereabouts, saying they were out on loan or with an employee, when in all actuality, they had been sold and Rose City had pocketed the cash. (*See* Attachments to Westlake's Answer and Crosscomplaint [22] Ex. 2 at 9–13.)

**(3) Materiality** – Certainly Westlake would not have loaned the money but for Rose City's promise to pay.

**(4) Shiley's knowledge of falsity or ignorance of truth** – Ordinarily, in Oregon, fraudulent intent may not be inferred at the time the promise is made from the mere fact of nonperformance. *South Seattle Auto Auction Inc. v. Western Cas. & Sur. Co.*, 41 Or. App. 707, 714 (1979). However, a promise made with reckless disregard is actionable. *Id.* at 714. In *South*

*Seattle Auto Auction*, the court concluded that it was proper to find fraudulent intent when the defendant's scheme was viewed in its entirety. *Id.* While courts cannot find fraud if the course of events is equally susceptible to two explanations, one consistent with fraud and one consistent with fair dealing, that was not the case there. *Id.* Viewing the events in their totality, the two explanations were not *equally* probable, rather "fraud [was] the obvious conclusion." *Id.*

This same analysis holds here. Viewing Rose City's actions in their totality, the dealer was obviously engaged in a fraudulent course of conduct. This conduct began with the false, or at least reckless, promise to pay Westlake. Rose City continued to deceive Westlake about the sales of vehicles when it was directly asked about sales and lied, saying vehicles were still on its lot long after they had sold. And according to UCCU, at least with the Subaru Shiley sold back to Rose City (then financed by Westlake) the entire transaction was fraudulent. Based on this evidence, just as in *South Seattle Auto Auction*, "fraud is the obvious conclusion." *Id.*[7]

**(5) Intent that it be acted on** – Rose City intended Westlake to part with its money.

**(6) Westlake's ignorance of the falsity** – The evidence shows Westlake was not aware of Rose City/Shiley's intent to pocket the money it loaned.

**(7) Reliance** – It is clear a lender relies on the promise to repay when it loans money.

**(8) Right to rely** – *South Seattle Auto Auction* established that a lender has a right to rely on a borrower's promise to repay. *Id.* at 714.

**(9) Consequent and proximate injury** – This is another element on which Westlake offers little evidence. I first note that none of the evidence submitted by Westlake attached to its Answer and Crosscomplaint [22] is authenticated in any way whatever. There is no declaration explaining how these are valid business records rather than nonadmissible hearsay. The

---

[7] The conclusion that fraudulent intent was present at the time the promise was made is also bolstered by the short timeframe on many of these events

9 – OPINION

purported "audit/investigation" by Mr. Amato, on which Westlake seems to heavily rely, contains no certification as to its veracity. Nonetheless, I find this documentation supports the fact of *some* injury, even if the amount is not well stated. It is clear that Rose City made a fraudulent promise to pay and defaulted on at least some portion of its debt to Westlake.

### 2. Damages

In its Supplemental Response [66], Westlake submits a chart of its claimed damages, broken down by each vehicle, totaling a claim for $18,918.05. Unfortunately, Westlake completely fails to explain how it arrives at these numbers. These figures do not match the documentation attached to its crosscomplaint, which result in a damage calculation significantly smaller than Westlake's request.

Before continuing, I note that Twinstar accused Westlake of holding title to three vehicles included in its original damage calculation. Because Westlake holds security in these loans, the lender has not shown any damages due to the dealer's fraud with respect to these vehicles. In response to this accusation, Westlake amended its claim to withdraw damages based on ten vehicles it admitted holding title to. Strangely, it did not withdraw claims based on two of the three vehicles Twinstar mentioned, a 1993 Cadillac Fleetwood and a 1999 Volkswagen Passat. Because Westlake did not refute the accusation that it did in fact hold title to those vehicles, I assume that it does. Like the other vehicles it holds title to, Westlake has not proven any damages suffered as a result of Rose City's fraud. The lender may not have gotten what it wanted, but it got what it bargained for.

This leaves nine vehicles for which Westlake does not hold title because they were fraudulently sold out from under their loan agreement with Rose City. Because the chart proffered by Westlake is not supported by evidence, I turned to the actual documentation

attached to the crosscomplaint [22]. These documents include a number of "Buyer's Settlement Reports," which are essentially transaction summaries showing the amounts Rose City bid on each vehicle at auction and the corresponding loan amount that Rose City would have to repay upon sale of each particular vehicle. Because these numbers are the only ones supported by even arguably admissible business records, I used those to calculate Westlake's damages.

| Vehicle | Loan Amount |
|---|---|
| 2003 Dodge Durango | $1590.00 |
| 2005 Ford Focus | $1590.00 |
| 2000 Chevrolet Malibu[8] | $0 |
| 2004 Chevrolet Malibu[9] | $2800.00 |
| 2000 Chevrolet Tracker | $1510.00 |
| 1996 Mitsubishi 3000 | $1851.19 |
| 1993 Mercedes-Benz 300[10] | $27.09 |
| 2001 Volvo V70[11] | $16.24 |
| **TOTAL** | **$9384.52** |

### III.    Apportionment of Claims by Persons Other Than Retail Customers

As noted above, the bond statute itself provides that "the maximum amount available under a bond described in . . . this section for the payment of claims by persons other than retail customers of the dealer is $20,000." ORS 822.030(3). The non-consumer claimants argue for an interpretation that would pay out beyond that, based either on the fact the Stoners claim only a small portion of the bond, or on an interpretation of the statute that would read this limitation out of the law.

---

[8] There was no evidence at all regarding the loan amount of this vehicle other than the chart proffered by Westlake.
[9] The only evidence of this was not even a loan amount from Westlake, but simply the purchase price paid by Rose City. (*See* Attachments to Answer and Crosscomplaint [22] Ex. 2 at 63).
[10] Westlake's claim for this vehicle asks for less than the initial loan amount indicated on the "Buyer's Settlement Report." I take this as a representation by Westlake's attorney that only the claimed amount remains outstanding on the loan.
[11] *Same as note 10 above.*

11 – OPINION

Since the wording of the statue is ambiguous and both context and case law are deficient concerning this interpretation, I look to the legislative history. *See Portland Gen. Elec. Co. v. Bureau of Labor & Indus.*, 317 Or. 606, 611–12 (1993). At this step, courts may give the legislative history whatever weight it "considers to be appropriate." *State v. Gaines*, 346 Or. 160, 166, (2009).

Fortunately, the legislative history of ORS 822.030(3)—not provided by any of the parties—makes the wording of the statute abundantly clear. The legislature intended a two tiered bond that would provide $20,000 for all claimants (including retail and non-retail claimants alike), and expressly reserving the other $20,000 of the bond for retail consumers only.[12] Given the legislative history, it is clear the $20,000 limit is the *total amount* that can be paid to *all* "persons other than retail customers" under ORS 822.030.

---

[12] The language that eventually became ORS 822.030(3) began as an amendment to 2001 House Bill 3971. The bill originated in the House Committee on Smart Growth and Commerce, where one of its drafters and an advocate for the bill, Darrell Fuller of the Oregon Auto Dealers Association, testified on its behalf, explaining the bond:

> [The] second thing the bill does is restrict access to the bond above twenty thousand dollars to consumers only. Something we learned in the 1999 session is that because the bond is available to anybody having a claim against the dealership that has failed, and because banks, lending institutions, and other dealers are generally aware of a dealership failure before consumers are aware it, . . . dealers were getting about 80% of the value of the bond in a failure, and consumers were only getting about 20% of the bond, so a bond that was designed essentially to be a consumer protection was essentially paying off other lenders and other dealers and consumers weren't getting very much benefit. So on a twenty thousand dollar bond, consumers who were hurt by a dealership failure would only see five thousand dollars of that twenty thousand dollar bond or less. So by restricting access to bonding amounts over twenty thousand dollars to consumers only, by the time we get to a forty thousand dollar bond, where consumers have access to twenty thousand— exclusive access to twenty thousand dollars of that bond, we're essentially quadrupling the consumer protection in a very short number of years from five thousand dollars, what consumers are getting today, to twenty thousand dollars or more. Now it doesn't restrict consumers from having access to the other twenty thousand of that forty thousand dollars. Consumers will fight it out with other lending institutions and other dealers for the original twenty thousand dollars of the bond, but anything over that twenty thousand dollars would be accessed to consumers who were hurt only.

Public Hearing on 2001 H.B. 3971 Before the H. Comm. on Smart Growth and Commerce, 71st Leg. Assembly (Ore. Mar. 21, 2001) (statement of Darrell Fuller).

The Chair of the Committee, Representative Bill Witt, echoed this same understanding. He explained, "by adjusting the bonding requirements . . . what we're doing is we're increasing consumer protection and limiting financial institutions and other businesses to twenty thousand dollars of the bond." *Id.* (statement of Rep. Bill Witt, Chairman of the H. Comm. on Smart Growth and Commerce). The bill moved out of committee with a "do pass" recommendation. When it came before the Senate Committee on Business, Labor, and Economic Development on April 16, 2001, Mr. Fuller again gave a similar explanation of the bill. The bill again moved out of that committee with a "do pass" recommendation and without further amendment. It was enacted in 2001 Oregon Laws chapter 141.

12 – OPINION

\\

\\

\\

### IV.     The Claims and Final Distribution

UCCU makes a solid claim for $17,976.23. Westlake has stated a claim for $9384.52. With only $20,000 available for payment of non-retail consumer claimants, these two must be reduced *pro rata*. This results in a final disbursement as follows.

| | | | |
|---|---|---|---|
| **UCCU** | 17,976.23 | 65.7% | **$13,140.** |
| **Westlake** | 9,384.52 | 34.3% | **$6,860.** |
| Twinstar | -0- | | -0- |
| **Stoners** | 1,001.04 | not reduced | **$1,001.04** |
| | | | $21,001.04 |

| | |
|---|---|
| Total amount available to pay all claimants | $27,829.58 |
| Subtracting the claims paid | $21,001.04 |
| **Tower Insurance** is entitled to the residue of | **$6,828.54**. |

### CONCLUSION

Plaintiff Tower's Motion for Resolution of Claims and Final Disbursement of Funds [53] is GRANTED. Steven Stoner's Motion [41] is GRANTED. A separate Order of Disbursement will follow.

DATED this   17th   day of April, 2015.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge